# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SARA MICHELLE POKLUDA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:13-335 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Sara Michelle Pokluda ("Pokluda") seeks review of an adverse decision on her applications for disability-based benefits under the Social Security Act.

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision.  *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).  Neither can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance.  *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

When reviewing acts of administrative agencies, courts also must take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights"). Thus, judicial review is quite deferential to the Commissioner's presumed expertise.

## II.  Background

Pokluda, at age 24, applied for disability-based social security benefits due to fribromyalgia, migraines, and depression.  (T.173).[1]  A video evidentiary hearing was held before administrative law judge Maria Teresa Mandry ("ALJ Mandry") who presided over the hearing from San Juan, Puerto Rico.  (T. 17, 31-71).  Pokluda attended the hearing in Albany, New York, *pro se*, and testified through interactive video.  (*Id.*).  Also testifying by video were medical experts, Ramon Morales, M.D. ("Dr. Morales") and Amarilis Serrano, Psy.D. ("Dr. Serrano") and a vocational expert, Marieva Puig, Ph.D. ("Dr. Puig").  (*Id.*).

ALJ Mandry denied Pokluda's applications on September 21, 2011.  (T.17-27).  Pokluda filed a *pro se* request for review with the Appeals Council of the Social Security Administration's Office of Hearings and Appeals.  (T. 72-73).  Pokluda then retained legal counsel who submitted a brief and also proposed additional evidence.  (T. 217-19, 324, 325-31).  After considering the brief and additional evidence, the Appeals Council denied Pokluda's request to review. (T. 1-6).  This rendered ALJ Mandry's opinion the final decision.  Pokluda then instituted this proceeding.

---

[1]  "T." followed by a number refers to the page of the administrative record.  (Dkt. No. 8).

### III. Commissioner's Decision

ALJ Mandry utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act.[2] At Step 1, she determined that Pokluda, although employed and working part-time, was not engaged in "substantial gainful activity" within the meaning of the Act.[3] (T. 19). At Step 2, she found that Pokluda suffers from certain conditions (fibromyalgia and migraine headaches) that are "severe impairments" in that they produce more than minimal functional limitations. (T. 19). She declined, however, to find that Pokluda has a severe mental impairment because she found that Pokluda's mood disorder causes no more than minimal limitations in her ability to perform basic mental work activities. At Step 3, ALJ Mandry found that Pokluda's impairments, singly or in combination, are not so extreme in degree as to be presumptively disabling under the Commissioner's listings of presumptively disabling mental and physical impairments.[4] (T. 20).

---

[2] The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[3] "Substantial gainful activity" or "SGA" is "work that involves doing significant and productive physical or mental duties" done for pay or profit, and may include part-time work even if it includes less responsibility or pay than work previously performed. 20 C.F.R. §§ 404.1510(a)(b), 404.1572, 416.910(a)(b), 416.972. Generally, when earnings from employment exceed a certain threshold amount specified in the Commissioner's regulations, it is presumed that she has demonstrated the capacity to engage in substantial gainful activity. *See* 20 C.F.R. §§ 404.1574, 416.974.

[4] The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). Listed impairments are presumptively disabling. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

Before proceeding to Steps 4 and 5, ALJ Mandry made a predicate finding of "residual functional capacity."[5] She found that Pokluda has residual functional capacity to perform work at the light exertional levels, but with certain non-exertional limitations limiting her to simple and repetitive jobs involving no exposure to unprotected heights or hazards, pulmonary irritants, dust or extreme temperatures, and only occasional work under fluorescent lights.[6] (T. 20-24).

Based on this residual functional capacity assessment, ALJ Mandry found at Step 4 that Pokluda lacks ability to perform her past relevant work as a deliverer, stock checker clerk, retail clerk, and salesperson because some required more standing and walking than Pokluda's residual functional capacity allows, and all but one (deliverer) were performed inside with fluorescent light

---

[5]     "Residual functional capacity" refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96-8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *2 (July 2, 1996). Regarding mental impairments, an administrative law judge must take into consideration limitations on a claimant's "understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting ...." *See* 20 C.F.R. §§ 404.1545(c), 416.945(c).

[6]     ALJ Mandry's complete "residual functional capacity" finding was:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she is able to carry and list and push and pull up to 20 pounds occasionally and 10 pounds frequently, and can perform work activities that involves sitting for 6 hours and walking fo 4 hours in an 8-hour workday allowing alternating at will. She can perform simple and repetitive jobs, where she is not exposed to unprotected heights or hazards. She is occasionally able to work under fluorescent lights and is able to work were there are no pulmonary irritants, dust or extreme temperatures. She is able to work on computers in simple repetitive tasks, follow and understand directions, respond and adapt to changes, and make job related decisions.

(T. 20).

issue and/or frequent interaction with public.  (T. 24).  Pokluda thus carried her burden to prove a *prima facie* case of disability[7];  the burden then shifted to the Commissioner to show at Step 5 that Pokluda can still perform alternative and available work.[8]

At Step 5 of sequential evaluation, administrative law judges determine whether claimants who have demonstrated *prima facie* cases of disability can, nevertheless, perform alternative, available work.  A vocational expert, Dr. Puig, testified that a person with Pokluda's residual functional capacity and limitations can perform requirements of light and unskilled occupations such as parking lot attendant and parking lot signaler.  (T. 25, 67-68).  ALJ Mandry found this testimony credible.  Consequently, Pokluda's applications were denied on the basis that her impairments do not prevent her from engaging in substantial gainful employment.  (T. 25-26).

## IV.  Points of Alleged Error

Pokluda proffers three alleged errors:

1.    Whether the claimant was denied Due Process and Equal Protection;

2.    Whether [the claimant] was capable of sustained *light* substantial gainful activity from January 1, 2009; and,

3.    Whether failure to consider the claimant's obesity and mental health diagnoses is reversible error.

(Dkt. No. 10, pp. 1-2, 5-22).

---

[7]    *See Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984).

[8]    *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998); *Berry*, 675 F.2d at 467; 20 C.F.R. §§ 404.1566, 416.966.

In response to each point, the Commissioner argues that ALJ Mandry employed correct legal principles and that her factual findings are supported by substantial evidence.[9] (Dkt. No. 15, pp. 4-12).

## V.  Discussion and Analysis

*A.    Constitutional Challenge*

In cases of individualized decisionmaking, administratively-determined adjudicative facts and decisional protocols that allegedly violate rights protected by the Constitution are subject to judicial review.  Pokluda's brief argues that she is a victim of such individualized deprivations of rights to "due process of law" and "equal protection of the laws" under the Fifth and Fourteenth Amendments.  Her arguments supporting supposed violations of these rights, however, consist mostly of emotional rhetoric and conclusory statements rather than substance.

1.    Due Process

The Fifth Amendment provides that no person will "be deprived of life, liberty or property without due process of law." U.S. Const. amend. V.  A claim of entitlement to social security benefits triggers Due Process Clause protections. *Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976).  In the context of an administrative social security hearing, however, Due Process requires only that the proceedings be "full and fair."  *Richardson v. Perales*, 402 U.S. at 401–02; *Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982).  They need not be "full-blown adversarial hearing[s]." *Bush v. Shalala,* 94 F.3d 40, 46 (2d Cir. 1996).  Instead, administrative proceedings can and should

---

[9]      Under this district's practice, the parties marshal their arguments through competing briefs.  *See* General Order #18, September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders).  (Dkt. No. 3).

be "informal," "liberal," and "not strict in tone and operation." Their overall conduct ultimately "rests . . . in the examiner's discretion." *Perales*, 402 U.S. at 400–01.

Pokluda's specific quarrels are addressed below, but it is worth noting as a threshold matter that her administrative hearing was "full and fair" in every sense as that term is commonly understood. Pokluda received notifications prior to the hearing explaining the process and her rights; she attended the hearing, testified, was able to hear and question all witnesses, and was allowed to present evidence. ALJ Mandry assembled and considered all of Pokluda's medical records. She considered and credited opinions expressed by Pokluda's attending physicians; she obtained an internal medicine examination and a psychiatric evaluation from consulting physicians whose findings and opinions were recorded in written reports appearing in the evidentiary record; and additionally she obtained testimony from *two* medical experts regarding Pokluda's physical and mental impairments and accompanying limitations, together with expert vocational testimony regarding Pokluda's vocational abilities with respect to her past work and potential alternative work. There is no obvious substantive or procedural due process deficiency in how ALJ Mandry adjudicated Pokluda's claim.

###### a.   *Interactive Video Hearing*

ALJ Mandry presided and received testimony remotely utilizing interactive video technology. While Pokluda was in Syracuse, New York, and ALJ Mandry was in San Juan, Puerto Rico, they could see and hear each other and also the witnesses who testified. Jurists, legal counsel and litigants of reason may have divergent views as to whether evidentiary proceedings of this sort detract from their dignity, solemnity and effectiveness, but, as courts and

administrative agencies are asked to do more with less, video proceedings are now an accepted fact of life, providing an effective and efficient means to curtail costs and expedite proceedings in an overburdened system for the benefit of claimants. The Commissioner's regulation expressly permits evidentiary hearings by video teleconferencing. 20 C.F.R. §§ 404.936(c), 416.1436(c);[10]*see also* 20 C.F.R. §§ 404.950(e), 416.1450(e) ("Witnesses may appear at a hearing in person or, . . . by video teleconferencing. . . .").

In any event, Pokluda is in no position to complain. In July 2011, ALJ Mandry provided Pokluda an advance "Notice of Hearing" advising, *inter alia*, of her intent to use video teleconferencing ("VTC") at the hearing, but that if Pokluda did "not want to appear by video teleconference," ALJ Mandry would "arrange an in-person appearance for [her] on the next available hearing date." (T. 98). The form further gave instructions as to how Pokluda should proceed if she did not want to appear at her hearing by VTC. (*Id.*). Pokluda raised no objection.

### b.  *Foreign Accents*

Pokluda premises a Due Process claim on an argument that her hearing was unfair because it was a conducted by a Puerto Rican administrative law judge, and the three experts who testified spoke in technical terms with heavy foreign accents. (Dkt. No. 10, p. 5). This point is not cognizable on judicial review because factual assertions on which it is premised are not apparent from the evidentiary record before the court. But, even if ALJ Mandry is of Puerto

---

[10]     On July 29, 2013, the Regulations were amended to include testimony by telephone. 20 C.F.R. §§ 404.936(c), 416.1436(c). The regulations in effect at the time of Pokluda's hearing, however, did not address testimony by telephone.

Rican heritage, and even if testifying experts used technical terms and spoke with foreign accents, that is no basis for declaring a *per se* constitutional error.

Pokluda speaks English;[11] ALJ Mandry conducted the proceedings in English; all witnesses spoke in English; the transcript of testimony and all medical records are in English; and ALJ Mandry's decision is written in English. At the commencement of the hearing, ALJ Mandry admonished Pokluda that, "it's important that if you feel you don't understand something to please let me know so that I can repeat any question or clear anything that you need to understand." (T. 36). At no point during the hearing did Pokluda indicate that she was having difficulty communicating or understanding the proceedings. Rather, she responded appropriately and directly to ALJ Mandry's questions and queries.

Pokluda fails to identify a single instance where she was unable to understand or otherwise disadvantaged by any communication impediment issues at the hearing. Absent such a showing, there is no colorable constitutional challenge. *See Tankisi v. Commissioner of Soc. Sec.,* 521 Fed. App'x 29, 31-32 (2d Cir. 2013) (summary order) (no denial of full and fair hearing where claimant failed to show specific issues that were misunderstood by allegedly ineffective interpreter); *see also Bao Jun Liu v. Holder*, 478 Fed. App'x 692, 695 (2d Cir. 2012) (summary order) (no due process violation and no prejudice in immigration hearing where "alleged mistranslations did not result in any significant loss of meaning"); *Zaien Chen v. Mukasey*, 271 Fed. App'x 104, 105–06 (2d Cir. 2008) (summary order) (no due process violation where petitioner failed to identify a mistranslation touching on a dispositive issue at immigration hearing); *Alvarez v. Commissioner of the Soc. Sec. Admin.*, Civil No.

---

[11]     (T. 172).

10–890 (JBS), 2011 WL 2600712, at *4 (D. N.J. June 28, 2011) (declining to remand to provide interpreter when at no point did claimant seek clarification of a question; there were no more apparent misunderstandings; and, none of the moments of disconnect were clearly attributable to claimant's language abilities).

c.    *Transcript*

Pokluda points out that the official transcript contains gaps and omissions, consisting of at least 17 "inaudibles" during the questioning and responses of the three expert witnesses, and complains that the Commissioner thus deprived her of Due Process by failing to provide her current attorney with an accurate or complete record for review.  (Dkt. No. 10, p. 6).  Incomplete administrative transcripts, however, do not warrant automatic reversals on constitutional or other grounds.  The test is not whether the Commissioner has provided counsel with everything counsel might desire, but whether the transcript that remains before the court permits  meaningful or informed review.[12]

In any event, Pokluda fails to identify even one part of the transcript that is inaccurate or incomplete and/or how any part of the hearing responses or "inaudibles" actually disadvantaged her.  Hence, on its face, she cannot assert a violation of any constitutional right.  *See Brewer v. Astrue*, 2012 WL 896238, at *4 (N.D. Okla. Mar. 15, 2012) (court denied remand when claimant failed to submit any evidentiary support establishing that the omission precludes meaningful judicial review; failed to establish a due process violation but simply pronounced there to be one; and failed to demonstrate any omission was "material").

---

[12]    "The touchstone is whether the administrative record that does exist permits meaningful judicial review." *Brady v. Apfel*, 41 F. Supp.2d 659, 668 (E.D. Tex. 1999) (citing *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 594 (1980)).

### d. *Notice*

Pokluda complains that her right to Due Process was abridged by not having received adequate information of her right to legal representation, her right to cross-examine witnesses, and her ability to object to a video hearing. (Dkt. No. 10, p. 6). "Although a claimant does not have a constitutional right to counsel at a social security disability hearing, she does have a statutory and regulatory right to be represented should she choose to obtain counsel." *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010). The Commissioner must "notify each claimant in writing . . . of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner. . . ." 42 U.S.C. §§ 406(c) and 1383(d)(2)(D); *see also* 20 C.F.R. §§ 404.1705, 404.1706. Such notification must "also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge." *See id*; *Polhamus v. Astrue*, No. 6:12–cv–192 (GLS), 2013 WL 422092, at *1 (N.D.N.Y. Feb. 1, 2013) (quoting *Lamay*, 562 F.3d at 507). Additionally, at the hearing itself, "the ALJ must ensure that the claimant is aware of [his] right [to counsel]." *Id.* (quoting *Lamay*, 562 F.3d at 507 (internal quotation marks and citation omitted)).[13] But, once properly informed of these rights, a claimant may waive them. *Lamay*, 562 F.3d at 507.

Although there always is room for subjective debate as to what is "adequate," there is no question that Pokluda received objectively reasonable notices. When Pokluda's claim was initially rejected in August 2010, she received a "Notice of Disapproved Claim" advising that if she disagreed with the

---

[13]    Some circuits require additional or enhanced disclosures that are broader than those mandated by statute; however, the Second Circuit has declined to adopt this approach and has found no agency error when §§ 406(c) and 1383(d)(2)(D) disclosure requirements are met. *See Lamay*, 562 F.3d at 508.

decision she could request an evidentiary hearing before an administrative law judge. That notice stated:

> [t]he hearing is your chance to tell the ALJ why you disagree with the decision in your case. *You can give the ALJ new evidence* and bring *people to testify for you.* The ALJ also can require people to bring important papers to your hearing and give facts about your case. *You can question these people at your hearing.*

(T. 79) (emphasis added). This Notice further advised her of the *right to be represented by an attorney* and directed her to enclosed information wherein she could find more information about the hearing. (*Id.*).

In a letter dated November 17, 2010, Pokluda was advised that her request for hearing had been received. It included repetitive information and other attachments about the hearing process, and informed Pokluda again of her right to legal representation, that some private lawyers charge only if she receives benefits, that some organizations may be able to represent her free of charge, a list of groups that can help her find a representative, and information about customary fees.[14] (T. 86-93).

In July 2011, Pokluda received a Notice of Hearing from ALJ Mandry, advising of the date, time, location of hearing, the intent to use video teleconferencing ("VTC") at the hearing, advising what to do if she did not want to appear at her hearing by VTC, her right to legal representation, issues to be considered, and other things that would happen at the hearing. (T. 97-108).

---

[14]      Regarding attorney fees, the letter provides:

    Some private lawyers charge a fee only if you receive benefits.
    Some organizations may be able to represent you free of charge.
    Your representative may not charge or receive any fee unless we
    approve it. We are enclosing a list of groups that can help you
    find a representative.

(T. 87).

Finally, on the day of the hearing, ALJ Mandry opened the hearing by informing Pokluda of her right to representation and explaining how the hearing would proceed. (T. 33-35). This was at least the *fourth* notice to Pokluda of her right to legal counsel and of hearing procedures. Pokluda then executed a written "Waiver of Right to Representation."[15] (T. 146-147).

There is no basis for a reviewing court to conclude that Due Process was offended for lack of adequate notice of the right to legal representation or of hearing procedures.

     *e.*    *Mistaken Identity*

Pokluda asserts (correctly) that ALJ Mandry misidentified a testifying medical expert as "Dr. German Malaret" when, in fact, the witness was Dr. Ramon Morales.

If embarrassing or inexcusable sloppiness in an administrative law judge's decision were a legitimate basis to reverse, this point might have merit on extra-constitutional grounds. ALJ Mandry's decision reveals, however, that the testimony she considered was, in fact, that of Dr. Morales, not of Dr. Malaret or any other extrinsic witness. (*Id.*) Notwithstanding the incorrect appellation, ALJ Mandry describes the substance of Dr. Morales's assessment of fibromyalgia and treatment history, her unremarkable physical findings, and history of asthma and headaches. (T. 23).

---

[15]    When signing the "Waiver of Right To Representation," Pokluda acknowledged that she understood that she had the right to be represented in the proceeding; she had received a representative referral list and was offered an opportunity to defer a decision in her appeal until she could contact sources on the list or other source representation; and that she had considered the matter and decided to waive her right to representation and chose to go forward without representation. (T. 146).

Pokluda fails to offer anything beyond a bare allegation that she has been deprived of a substantial right. There is no basis to conclude that Pokluda was deprived of her constitutional right to a full and fair hearing due to a simple, non-substantive misnomer mistake.

### f.    *New Evidence*

Pokluda's final Due Process argument is that the Appeals Council failed to discuss her new evidence in any "meaningful way." (Dkt. No. 10, at pp. 7-8). While Due Process requires that administrative adjudicators consider all relevant evidence properly adduced at an administrative hearing, it does not guarantee consideration of evidence not presented until after an administrative law judge issues a decision. Indeed, Congress acted in 1980 to limit the power of district courts to order remands for 'new evidence' in Social Security cases." *See Melkonyan v. Sullivan*, 501 U.S. 89, 100-01 (1991). Reviewing courts now may order that additional evidence be taken before the Commissioner:

> only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . .

42 U.S.C. § 405(g).

Consistent with the 1980 Amendment, the Commissioner promulgated a regulation relating specifically to Appeals Council review of new evidence. In addition to requiring that evidence be new and material, the regulation provides:

> (b) . . . if new and material evidence is submitted, the Appeals Council shall consider the additional evidence *only where it relates to the period on or before the date of the administrative law judge hearing decision.*

20 C.F.R. §§ 404.970(b), 416.1470(b) (emphasis added).

Here, Pokluda's brief filed in support of review with the Appeals Council described the proposed new evidence as "*up-to-date* and new records" (emphasis added) from Dr. Craig (Gail Casals, FNP) for "office visits 1/30/12 through 9/24/12 (15 pp)" and a sleep study performed 5/12/12 by Dr. Shoharani Sundaram, M.D., which confirmed "mild sleep disordered breathing." (T. 218). He suggested that such records were consistent with complaints of "fatigue, loss of concentration, and headaches" and a "recognized risk considering [claimant's] struggle with morbid obesity." (*Id.*).

When denying Pokluda's request for review, the Appeals Council acknowledged receipt of her counsel's brief and the additional medical evidence. Specifically, the Appeals Council noted that it *considered* some additional evidence listed on an enclosed Order with the entire record. (T. 2, 6).[16] The

---

[16]    In this regard, the Order of Appeals Council provides:

The Appeals Council had *considered* additional evidence which it is making part of the record. That evidence consists of the following exhibits:

| | |
|---|---|
| Exhibit 11E | Representative Brief from Stephen J. Mastaitis dated November 4, 2012 |
| Exhibit 9F | Medical Report from Clifton Family Health dated September 8, 2011 |
| Exhibit 10F | Medical Records from Seton Health for Women dated January 2, 2009 through December 27, 2010 |

(T. 6; see also 324, 325-331).  Additionally, in its denial of review, the Appeal Council also noted that it *looked* at the following:

medical records from Clifton Park Family Health dated January 30, 2012 to September 4, 2012; laboratory results from St. Mary's Hospital dated April 23, 2012; diagnostic sleep study dated May 2, 2012; and medical records from Seton Health for Women dated April 23, 2012 through October 1, 2012.

(T. 2).

Appeals Council then explained that it had *looked* at other evidence that did not warrant further review because:

> The Administrative Law Judge decided your case through September 21, 2011. *This new information is about a later time.* Therefore, it does not affect the decision about whether you were disabled beginning on or before September 21, 2011.
>
> If you want us to consider whether you were disabled after September 21, 2011, you need to apply again. We are returning the evidence to you to use in your new claim.

(T. 2) (emphasis added).

The Appeals Council gave an adequate reason for not giving the new evidence further consideration, and there is no basis to conclude that Pokluda was deprived of due process of law in the Appeals Council's treatment of that evidence.

2. Equal Protection[17]

Pokluda's brief does not articulate any argument that specifically invokes the Equal Protection Clause. She does not claim that she is a victim of selective enforcement or application of the law, or that she was treated differently from others similarly situated on an impermissible ground, or that the Commissioner acted with malicious or bad faith intent to injure. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

---

[17] The Fourteenth Amendment provides that no *state* shall deny to any person with its jurisdiction "the equal protection of the laws." U.S. Const. amend XIV. By its terms, the Equal Protection clause restrains only state governments. Nonetheless "there is a well-established equal protection component to the Fifth Amendment Due Process Clause applicable to the federal government." *Skelly v. I.N.S.*, 168 F.3d 88, 91 (2d Cir. 1999) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Furlong v. Shalala*, 156 F.3d 384, 392 (2d Cir. 1998)). Equal protection claims under the Fifth amendment are treated virtually the same as those under the Fourteenth amendment. *See San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 542 n. 21 (1987).

suffice to state a[n] [equal protection] claim on which relief can be granted." *Martine's Serv. Ctr., Inc. v. Town of Wallkill*, ___Fed. App'x___, No. 13–1604–cv, 2014 WL 321943, at *2 (2d Cir. Jan. 30, 2014) (summary order) (internal citations and quotations omitted).

The record is devoid of any Equal Protection concerns. Rather, ALJ Mandry followed the same sequential evaluation procedure as is employed in all cases, citing and following the regulations and rulings that govern all cases.

There is no Equal Protection error.

B. *Substantial Evidence Challenges - Residual Functional Capacity*

Pokluda proffers arguments in scattergun fashion, some amplified, others conclusory. In the second segment of her argument (titled "The ALJ Failed to Properly Consider The Claimant's Obesity and Mental Health Impairments"), Pokluda complains that obesity and mental impairments were ignored or improperly assessed. In the third segment (titled "Sara Pokluda Is Not Capable Of Sustained Substantial Gainful Activity") she makes a similar argument regarding ALJ Mandry's credibility assessment of Pokluda's subjective testimony. At bottom, all these points relate analytically to ALJ Mandry's findings of Step 2 impairment severity and of residual functional capacity that preceded Step 4.

1.   Obesity

Pokluda cites to various progress notes that incidentally record gradually increasing weight from 187 pounds in April, 2008; 199 pounds in April, 2009; and, 220 pounds in August, 2010. (T. 260, 249, 310). She then cites cases and

an internal ruling for the proposition that administrative law judges have a duty to discuss effects of obesity on individuals' abilities to perform basic work activities. Finally, Pokluda correctly observes that ALJ Mandry did not mention or discuss her obesity at any step of the sequential evaluation process, either separately or in conjunction with other impairments.

While obesity is not in and of itself a disability, an administrative law judge should consider whether obesity, in combination with other impairments, prevents a claimant from working. *See* SSR 02-1p: TITLES II AND XVI: EVALUATION OF OBESITY, 2000 WL 33952015 (S.S.A. May 15, 2000). Here, however, it is important to factor that Pokluda did not claim disability based on obesity. Also, no medical source diagnosed Pokluda's obesity as a distinct medical condition, nor did any medical source find or opine that Pokluda's obesity is a significant factor relative to her ability to perform basic work activities. Pokluda's brief points to potential effects, but identifies no discrete item of evidence documenting that such effects exist presently.

Under this circumstance, ALJ Mandry was under no duty to discuss Pokluda's obesity, and the omission of that discussion was not error. *See Farnham v. Astrue*, 832 F. Supp. 2d 243, 261 (W.D.N.Y. 2011). Indeed, there was nothing to discuss. And, in any event, the omission was of no moment because ALJ Mandry's residual functional capacity assessment limited Pokluda to performing work only at the light exertional level. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (when an administrative law judge's decision adopts the physical limitations suggested by reviewing doctors after examining the claimant, obesity is understood to have been factored into their decisions). Pokluda's brief does not identify any potential limitations occasioned by her obesity that were not subsumed and already taken into account by ALJ

Mandry's residual functional capacity finding. Under these circumstances, ALJ Mandry's failure to explicitly address Pokluda's obesity does not warrant remand. *See Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005); *Skarbek*, 390 F.3d at 504.

## 2. Mental Impairment

ALJ Mandry did discuss Pokluda's mental impairment (mood disorder), and specifically found that it is not a severe impairment because it causes no more than minimal limitations in her ability to perform basic mental work activities. (T. 20). Pokluda argues that in a consultative psychiatric evaluation, Dr. Brett Hartman, Psy.D. found multiple symptoms consistent with Listing 12.04. (Dkt. No. 10, p. 14). In her brief, Pokluda calls them "findings." (*Id.*).

ALJ Mandry's decision reflects that she applied a "special technique" that the Commissioner mandates for determining at Step 2 whether mental impairments are severe.[18] (T. 20). ALJ Mandry considered the four broad functional areas for evaluating mental disorders, known as "paragraph B" criteria, finding Pokluda had no limitations in the areas of activities of daily living, social functioning, and concentration, persistence or pace. (*Id.*). She further found that Pokluda had experienced no episodes of decompensation which had been of extended duration. (*Id.*). Consequently, there is no question that ALJ Mandry was aware of and did apply correct principles of law when evaluating Mandry's mood disorder.

---

[18] When mental impairments are present, determinations of functional limitations stemming therefrom are accomplished in the aftermath of application of a "special technique" set out in 20 C.F.R. § 404.1520a(b)-(e), 416.920a(b)-(e); *see also Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008) (describing analysis).

Although severity of mental impairments is evaluated under a complex and abstruse "special technique," the bottom-line issue is the same as for physical impairments, *i.e.*, whether it causes more than minimal limitations in ability to perform basic work activities. ALJ Mandry determined that Pokluda's mood disorder does not cause more than minimal limitation in Pokluda's ability to perform basic mental work activities; thus, ALJ Mandry found it to be non-severe. (T. 20).

Pokluda points to no medical evidence to the contrary. She relies on Dr. Hartman's consultative psychiatric evaluation, but a review of that evaluation demonstrates that what Pokluda's brief characterizes as medical "findings" was mere dictation of what Pokluda complained of by history. (T. 319).

Finally, lack of a severe mental impairment finding is of no particular significance here. ALJ Mandry found that other disorders (fibromyalgia and migraine headaches) constitute severe impairments, and then conducted a full, 5-step sequential analysis.[19] ALJ Mandry expressly acknowledged that, in those subsequent steps, she was required to consider *all* impairments, *including impairments that are not severe.* (T. 18). And, importantly, her residual functional capacity finding accounts for *functional effects* of a mild mood disorder. ALJ Mandry's residual functional capacity assessment limits Pokluda to work involving simple and repetitive tasks. This limitation is relevant to

---

[19]    *See Stanton v. Astrue*, 370 Fed. App'x 231, 233 n. 1 (2d Cir. 2010) (summary order) (noting, in *dicta*, no reversible error in finding disc herniation non-severe because administrative law judge identified other severe claims at Step 2 so that claim proceeded though the sequential evaluation process and all impairments were considered in combination); *see also McCartney v. Commissioner of Soc. Sec.*, Civil Action No. 07-1572, 2009 WL 1323578, at *16 (W.D. Pa. May 8, 2009) ("Even if the Court was (*sic*) to find that the ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential evaluation on the basis of Plaintiff's severe and non-severe impairments.").

diminished mental residual functional capacity.  *See* 20 C.F.R. §§ 404.1545(c),
416.945(c).  Thus, ALJ Mandry effectively took into consideration all of Pokluda's
impairments, including mood disorder when developing her residual functional
capacity assessment.

There is no legal or evidentiary error with respect to ALJ Mandry's
treatment of Pokluda's mental impairment.

### 3.    Subjective Testimony

ALJ Mandry summarized Pokluda's subjective testimony as follows:

> The claimant testified that she is currently working 2 to 4 hours a day
> and has been working since December 2010, one day a week, since her
> father died.  She drives to different places and delivers Penny savers
> invoices.  This involves getting in and out of the car and walking, and a
> small amount of heavy lifting.  Her mother and boyfriend help her and
> she splits expenses.  She stated that she earns $200-$230 a week.  She
> also indicated that she stopped working starting this month.  She stated
> that she relates well with family members and reports that she spends
> her days watching television, going on the Internet, playing video games,
> doing light household chores, and taking care of her cat.
>
> *      *      *
>
> She further testified that she is able to walk for 30 minutes to 1 hour but
> standing still is hard.  The claimant added that she was glad that she is
> able to work one day a week but that she could not perform in a regular
> job because she wold have to miss too many days of work because of her
> unpredictable migraines and other conditions.

(T. 22-23).

ALJ Mandry weighted this evidence as follows:

> I have considered the objective evidence and subjective factors and find
> that there is little evidence of limitations on file.  Her complaints of pain
> and other symptoms as stated in the hearing and on the record, find little
> support.  She complained of pain mostly in her hips, knees, fingers and
> wrists.    The consultative examination, however, did not find any
> limitations in musculoskeletal movement, joints were non-tender and not
> swollen. The only findings were a few trigger points in the neck, shoulder,

and back. The laboratory results as she alleged was not documented and they are controlled with medications. At the consultative examination, she informed that the frequency was 1-2 per month, but at the hearing she stated the frequency was 3-4 monthly, however, as indicated previously, there are no supporting documents to explain her inconsistency. She stated that the headaches occur when she gets overheated and is exposed to fluorescent lights, if she avoids such triggers, she experiences a headaches less frequently. As for the alleged depression, there is no evidence of psychiatric treatment. As indicate above, she stated that she is currently working several hours a week, one day a week, but needs help from the mother and her boyfriend.

(T. 23-24).

### a.  Asserted Error

Pokluda's complaint about ALJ Mandry's treatment of the subjective evidence is not very clear. At one point, she claims that ALJ Mandry "completely failed to analyze and discuss the claimant's credible testimony." (Dkt. No. 10, p. 19). Elsewhere, she appears to argue inherent error due to failure to discuss her mood disorder; and, had there been such discussion, it would reveal that Pokluda has "moderate" functional limitations in the areas of concentration, persistence or pace along with frequent headaches that limit her ability to complete a normal work day or work week, which, in turn, would preclude sustained employment. (Dkt. No. 10, pp. 14-15).

### b.  Governing Rules

Testimony from claimants regarding persistence, intensity and limiting effects of symptoms is not only relevant, but desirable. On the other hand, it is subjective and may be colored by interest in obtaining a favorable outcome. An administrative law judge must, therefore, engage in a difficult task of deciding how much weight to give claimants' subjective self-evaluations.

The Commissioner provides explicit guidance. First, a formally promulgated regulation requires consideration of seven objective factors that naturally support or impugn subjective testimony of disabling pain and other symptoms.[20] Second, an interpretive ruling directs administrative law judges to follow a two-step process to evaluate claimants' allegations of pain:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .

> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96–7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (July 2, 1996). The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the

---

[20] An administrative law judge must evaluate a claimant's symptoms, including pain, based on medical and other evidence, including the following factors:

    (i)   claimant's daily activities;
    (ii)  location, duration frequency, and intensity of claimant's pain or other symptoms;
    (iii) precipitating and aggravating factors;
    (iv)  type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
    (v)   treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
    (vi)  measures claimant uses or has used to relieve pain or other symptoms; and
    (vii) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

Circuit law generally mirrors the Commissioner's Ruling. Thus, when an ALJ rejects a claimant's testimony of pain and limitations, he or she must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988); *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983).

c.   *Application*

Pokluda's claim that ALJ Mandry completely failed to analyze and discuss the claimant's credibility is without merit. ALJ Mandry, citing 20 C.F.R. §§ 404.1529, 416.929, SSR 96-4p, and SSR 96-7p, acknowledged all regulations and rulings that govern consideration of subjective evidence. (T. 21). She expressly referenced the two-step process for considering subjective symptoms. (*Id.*). These recitations document her awareness of and intent to apply correct legal principles.

ALJ Mandry's decision reflects that she then considered objective factors identified in the Regulation to the extent there was evidence thereof. She summarized the medical evidence regarding mental and physical issues. (T. 21-24). Such evidence (portions of which are reported in note 22, *infra*) encompassed all regulatory objective factors. Next, ALJ Mandry engaged in the two-step process as required by the applicable Ruling,[21] and articulated specific

---

[21]   ALJ Mandry engaged in the two-step process, finding:

I have considered the objective evidence and subjective factors and find that there is little evidence of limitations on file. Her complaints of pain and other symptoms as stated in the hearing and on the record, find little support. She complained of pain mostly in her hips, knees, fingers and wrists. The consultative examination, however, did not find any limitations in musculoskeletal movement, joints were non-tender and not swollen. The only findings were a few trigger points in the neck, shoulder, and back. The laboratory results as she alleged was not documented and they are controlled with medications. At the consultative

(continued...)

reasons for finding Pokluda's subjective complaints not fully credible, all as required by circuit law. Thus, there is no legal error in ALJ Mandry's approach to assessing credibility of Pokluda's subjective testimony regarding persistence, intensity and limiting effects of her symptoms.

To the extent that Pokluda complains that ALJ Mandry failed to discuss her mood disorder and any resulting limitations, she again is mistaken. ALJ Mandry notably considered the symptoms of depression (*e.g.*, sadness, crying spells, loss of energy, hopelessness, loss of interests, irritability, panic-like symptoms, including palpitations, chest pressure, trembling, *etc.*) that Pokluda reported to psychiatrist Dr. Brett T. Hartman during a consultative psychiatric evaluation. (T. 22).[22] And, importantly, ALJ Mandry factored the opinions of Dr. Hartman and Dr. Serrano related to Pokluda's mood disorder into

---

[21](...continued)
examination, she informed that the frequency was 1-2 per month, but at the hearing she stated the frequency was 3-4 monthly, however, as indicated previously, there are no supporting documents to explain her inconsistency. She stated that the headaches occur when she gets overheated and is exposed to fluorescent lights, if she avoids such triggers, she experiences a headaches less frequently. As for the alleged depression, there is no evidence of psychiatric treatment. As indicate above, she stated that she is currently working several hours a week, one day a week, but needs help from the mother and her boyfriend.

(T. 23-24).

[22]     ALJ Mandry also noted that Dr. Hartman's examination found her memory, attention and concentration were intact. (T. 22). She further observed that Dr. Hartman's finding that Pokluda has mild attention and concentration problems and mild difficulty performing complex tasks independently; she has mild-to-moderate difficulty maintaining a regular schedule and relating adequately with others; and, moderate difficulty dealing appropriately with normal stressors in life. (*Id.*).

Additionally, ALJ Mandry considered the testimony of medical expert, Dr. Serrano. (T. 23). She observed that Dr. Serrano testified that the record suggests a diagnosis of dysthymic disorder, which is a mild form of depression, as per Dr. Hartman's evaluation and that there was no other evidence in the file. (*Id.*). It was stated that Pokluda has no problems with concentration or activities of daily living. She can perform simple tasks and is able to learn new tasks. (*Id.*). Dr. Serrano stated that Pokluda's condition either singly or combination did not meet of equal a Listing. (*Id.*). Finally, it was noted that Pokluda could have some problems with irritability, but there would be no problems with concentration or with activities of daily living from the mental point of view. (*Id.*).

her residual functional capacity assessment to include that she can perform simple and repetitive jobs/tasks, follow and understand directions, respond and adapt to changes, and make job-related decisions. (T. 20).

Taking the foregoing into consideration as well as ALJ Mandry's undisputed finding that Pokluda has not sought or received any medical treatment for a mental condition, it is clear that ALJ Mandry amply considered and discussed Pokluda's mood disorder.

C.    *Challenge to Step 5 Finding of Ability to Perform Other Work*

Pokluda advances two arguments supporting her contention that substantial evidence does not support ALJ Mandry's Step 5 finding that she retains residual functional capacity for alternative and available work.

1.    <u>Medical-Vocational Guidelines</u>

Pokluda first argues that reliance on the Medical-Vocational Guidelines (the "grids") to determine whether she can perform other available work was improper because her exertional limitations are compounded by nonexertional limitations. (Dkt. No. 10, p. 13).

a.    *The "Grids"*

At Step 5 of sequential disability analysis, administrative law judges determine whether claimants, despite their impairments, can still do work existing in the national economy. At this stage, the burden rests with the Commissioner.

Generally, administrative law judges elicit or consult expert vocational testimony or officially-published data to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used. In some circumstances, however, they may take administrative notice of disability *vel non* by adopting and applying findings published in

"Medical–Vocational Guidelines," commonly called "the grids."[23] *See Roma v. Astrue*, 468 Fed. App'x 16, 20–21 (2d Cir. 2012) (summary order); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

When only exertional impairments are in play,[24] and findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, administrative law judges may directly apply the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue*, 337 Fed. App'x 87, 91 (2d Cir. 2009) (summary order); *Thompson v. Barnhart*, 75 Fed. App'x 842, 844 (2d Cir. 2003) (summary order) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

Grid rules cannot be applied directly when residual functional capacity findings do not coincide with all grid criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00. And, since the grids do not take into account limiting or disabling effects of nonexertional impairments,[25] direct application of the grids

---

[23] The Medical–Vocational Guidelines are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. They "take into account a claimant's residual functional capacity, as well as her age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n. 1 (2d Cir. 2009) (summary order) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996) (citing 20 C.F.R. § 404.1567(a)).

[24] An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b).

[25] "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect[ing] only your ability to meet ... demands of jobs other than ... strength demands ...." *See* 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Therefore, a nonexertional limitation is an impairment caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional. SSR 96-9p, Determining Capability To Do Other Work, Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 61 Fed. Reg. 34478, 34481 (July 2, 1996).

to determine disability is not appropriate when claimants' nonexertional impairments have more than a negligible impact on their ability to perform a full range of work. *See Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) (quoting *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010)). In such instances, additional, extrinsic evidence from a vocational expert or equivalent source is required. *Id.* Nonetheless, the grids may still be applied directly when nonexertional limitations only slightly erode the sedentary occupational base. *See* SSR 96-9p, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 61 Fed. Reg. 34478, 34481 (July 2, 1996).

### b. Application

ALJ Mandry looked to the grids, and determined that Pokluda's exertional impairments alone do not qualify for a finding of "disabled." (T. 25-26). She did not, however, rely solely on the grids. Rather, she used them as an analytical framework only, and received and relied on additional evidence, *i.e.*, testimony from vocational expert, Dr. Puig, with respect to the effect of additional nonexertional limitations. (*Id.*). Dr. Puig testified that a person with Pokluda's residual functional capacity and limitations (exertional and nonexertional) can perform requirements of light and unskilled occupations such as parking lot attendant and parking lot signaler. (T. 67-68). Thus, Pokluda's argument suggesting inappropriate reliance on the grids is unavailing.

### 2. Headaches

Second, Pokluda maintains that her headaches would preclude any finding that she can engage in alternative employment. (*Id.*, at 16). This argument, however, is not borne out by evidence of record. First, the frequency of migraines as alleged is not documented, and medical evidence indicates they are controlled with medications. (T. 23, 57-58, 307). The medical experts, Dr. Morales (physical) and Dr. Serrano (psychological) testified that Pokluda's

conditions did not substantiate a condition either singly or in combination that would preclude the performance of all types of work activities. (T. 56, 62,). Additionally, Dr. Puig testified that a person with Pokluda's limitations would not be precluded from all work.

Second, Pokluda admitted at the evidentiary hearing that when she avoids triggers (*e.g.*, fluorescent lights and overheating), she suffers headaches between only one to three times a month.[26] (T. 42). Giving Pokluda the benefit of the doubt, ALJ Mandry incorporated these restrictions (limited work under fluorescent lights and limited or no exposure to environmental triggers) into her residual functional capacity assessment that the vocational expert considered when expressing opinions regarding alternative, light work, unskilled jobs that Pokluda can perform. (T. 20). Consequently, substantial evidence supports ALJ Mandry's finding that Pokluda would be able to perform substantial gainful activity. *See Mancuso v. Astrue*, 361 Fed. App'x 176, 179 (2d Cir. 2010) (summary order) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983)); *see also Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).

## VI. Recommendation

Pokluda's request to remand this action should be DENIED. The Commissioner's decision should be AFFIRMED.

## VII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

---

[26] Pokluda reported during an internal medicine consultative examination that she has a history of headaches up to two times a month. (T. 307). ALJ Mandry noted that there were no supporting documents to explain her inconsistency. (T. 24).

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).


Signed on the ___21___ day of _____March_____ 2014.


_____
Earl S. Hines
United States Magistrate Judge